**Samuel GOLD, Howard Guy Halbett, John Frank Fusco, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 21176.

United States Court of Appeals Ninth Circuit.

June 16, 1967.

Raymond E. Sutton, Las Vegas, Nev., for appellants.

Joseph L. Ward, U. S. Atty., Robert S. Linnell, Asst. U. S. Atty., Las Vegas, Nev., for appellee.

Before MADDEN, Judge of the United States Court of Claims, and JERTBERG and BROWNING, Circuit Judges.

MADDEN, Judge:

Appellant Gold was convicted of knowingly using a common carrier for the carriage in interstate commerce of obscene film in violation of 18 U.S.C. section 1462 and of conspiring to commit that offense in violation of 18 U.S.C. section 371. Appellants Fusco and Halbett were convicted only of the conspiracy charge. We affirm.

Evidence presented to the jury showed that special agents of the Federal Bureau of Investigation maintained a surveillance during business hours of the premises of the Eastern Film Laboratories in Henderson, Nevada, for several days in October and November, 1965. During this time the special agents observed appellants Gold and Halbett entering and leaving the premises on various occasions.

On November 3, 1965, appellants Gold and Halbett arrived at the film laboratory in a Cadillac automobile. At approximately 2:40 p. m. they were observed loading five cartons into the Cadillac. After the cartons were loaded, Gold and Halbett were seen driving off together. At approximately 3:20 p. m. the vehicle and Gold alone were observed at the United Airlines freight dock at McCarran Field, Las Vegas, Nevada. Gold was then observed to deliver the five cartons to a United Airlines employee, who completed the air waybill. Gold paid the freight charge in cash and departed.

The waybill was made up from information supplied in part by Gold and indicated that the cartons contained "electronic controls." The shipping document and labels on the cartons themselves indicated that the shipper was Pont Distributors of 1020 South First Street, Las Vegas. A government agent had previously determined that 1020 South First Street was a nonexistent address, and the agent had been unable to identify any company by the name of Pont Distributors.

After the shipment had been delivered to United Airlines and appellant Gold had departed, the airlines customer service manager was contacted by the government agents and informed that the agents had reason to believe that the description on the air waybill of the contents of the packages was inaccurate and that the address of the shipper was nonexistent. The agents then left the manager's office. Though the manager asked them, they did not reveal what they suspected the true contents of the packages to be.

Sometime thereafter the manager decided to investigate further and directed a freight supervisor to take the shipment to the air freight room. There the supervisor and the manager opened one of the packages and discovered film containers. The manager looked at some of the film and subsequently notified the government agents. The agents returned and viewed the films with a projector. They advised the manager to keep the shipment locked in his office, and they returned the next morning with a warrant and seized the packages.

The packages never were sent on to their destination in New Jersey. It was stipulated that the films which the packages contained were obscene within the meaning of the statute.

Appellant Gold, joined on this point by the other appellants, contends that the trial court committed reversible error in denying several motions to suppress the obscene film which the prosecution offered in evidence. In support of their position that the search of the packages which resulted in discovery of the films was unconstitutional, appellants rely upon the recent decision of this court in Corngold v. United States, 367 F.2d 1 (9th Cir. 1966).

In Corngold government agents observed the defendant deliver packages to a Trans-World Airlines agent at the Los Angeles International Airport. When the defendant departed, the government agents informed the transportation agent that they suspected that the packages contained smuggled watches and that they would like to inspect the shipment. They also pointed out that the shipper had incorrectly filled out the air waybill. The transportation agent testified that

the government agents asked him to open the package. The employee initially opened one package while the government agents looked on, and then the agents completed opening the package. They found a number of small boxes inside the large package and removed and opened them. They found contraband watches and marked the small boxes for future identification.

On this evidence the court sitting en banc concluded that the search was in substance a search by the federal agents. It found that the airline employee had participated in the search solely to serve the purposes of the government and that the carrier had taken no action on its own behalf when the mislabeling was revealed. The search was without a warrant and the court, finding no circumstances justifying a search without a warrant, reversed the defendant's conviction.

The instant case differs from Corngold in several significant respects. After informing the manager of their suspicions regarding the shipment, the government agents left the premises. The manager, after attending to some other business, made the decision to investigate further. The shipment was taken from the freight area to the air freight room at the manager's direction. No one else was present while the manager and one other employee opened one of the packages. After finding the film and observing its nature, the manager determined that the matter "should be someone else's business." It was another 45 minutes to an hour after discovering the films before he got around to calling the government agents.

■ We conclude that the initial search of the packages by the airline's employee was not a federal search, but was an independent investigation by the carrier for its own purposes. Unlike Corngold, here the agents did not request that the package be opened, and they were not present when it was opened. The agents had the same right as any citizen to point out what they suspected to be a mislabeled shipping document,

and they exercised no control over what followed. What did follow was the discretionary action of the airline's manager and was not so connected with government participation or influence as to be fairly characterized, as was the search in Corngold, as "a federal search cast in the form of a carrier inspection."

While it might be expected that the carrier would not ignore the packages after being advised of the mislabeling by government agents who obviously had more than a citizen's interest in the shipment, the carrier had sufficient reasons of its own for pursuing the investigation. The manager testified that packages suspected of containing something other than what was described on the air waybill were sometimes opened so that the airline would know what was being carried on its airplanes, and so that it could assess proper charges. Despite the manager's inquiry, the government agents did not reveal what they suspected the true contents of the packages to be. His suspicions aroused, the manager had no way to determine whether the contents of the packages were fit for carriage and properly classified except by opening them. This the carrier had the right to do under its tariffs.

These same independent interests of the airline were relied upon by the government in Corngold to support the position that the search was nothing more than a carrier inspection carried out pursuant to the inspection clause of the airline's tariff. Here the facts support that theory. In Corngold they did not. The court below was correct in denying appellants' motion to suppress the films.

At the close of the government's case, the court, in response to the request of government counsel, took judicial notice of the fact that United Airlines is a common carrier engaged in interstate commerce, and so instructed the jury. Appellant Gold assigns this ruling as error. Gold does not contend that a carrier's status as a common carrier is not an appropriate subject of judicial notice. He did not at trial and does not here challenge the testimony of the United Air-

lines' employees who testified to the airline's interstate, common carrier operations. Rather he bases his objection upon the broad proposition that a court cannot, in a criminal case, take judicial notice of a fact which constitutes an element of the crime charged. He contends that the government's burden of proving every element of the crime charged cannot be fulfilled by the court's taking judicial notice of an element of the crime.

If the appellant's broad proposition is valid, it would mean that in a criminal case in a federal court in which there is a constitutional right to a jury trial, even the most obvious and indisputable facts, such as, for example, the fact that 12 o'clock midnight is in the nighttime, would have to be formally proved, at the risk that the failure to do so would require a reversal of an otherwise valid conviction. It would mean, at least, that the trial judge could not instruct the jury that midnight is in the nighttime.

In the case of State v. Duranleau, 99 N.H. 30, 104 A.2d 519, 45 A.L.R.2d 1166 (1954), Chief Justice Kenison, for the Supreme Court of New Hampshire, said, at page 522:

> Many years ago it was stated that "judges are not necessarily to be ignorant in Court of what everyone else, and they themselves out of Court, are familiar with. Lumley v. Gye, 2 El. and Bl., Q.B. 216, 267 (1853)."

In the New Hampshire case the court reversed the conviction because the fact of which the trial judge took judicial notice and so instructed the jury was not indisputable, and the appellate record did not show that the defendant was afforded an opportunity to dispute it.

The instant case presents no such problem as that involved in the New Hampshire case. The government, on the record, requested the court to take judicial notice that United Airlines is a common carrier engaged in interstate commerce. The appellant objected, and the court at first denied the government's request. Later the court advised the parties that it had decided to grant the request. The appellant did not, of course, offer or request an opportunity to offer evidence that United Airlines is not a common carrier engaged in interstate commerce. Equally of course, the appellant does not here request a reversal for the purpose of affording him such an opportunity. He requests a reversal so that the case may be tried again upon the same uncontradicted evidence of the government as to the status of the carrier, but without the court's judicial notice of the indisputable fact and its instruction to the jury that the fact existed.

■ Such a reversal would be completely formalistic and useless and is not required in order to preserve the right to trial by jury. The defendant in a criminal case has a constitutional right that the jury, regardless of the evidence against him, may acquit him. But he does not have the right that the jury should be free, in its deliberations, to decide that the earth is flat.

In Rosen v. United States, 161 U.S. 29, 16 S.Ct. 434, 40 L.Ed. 606 (1896), a case involving a prosecution for mailing obscene matter, the Court said:

> It has long been the settled doctrine of this court that the evidence before the jury, if clear and uncontradicted upon any issue made by the parties, presented a question of law, in respect of which the court could, without usurping the functions of the jury, instruct them as to the principles applicable to the case made by such evidence.

The Court, in Rosen, further said that if the trial court had instructed the jury that the material was obscene, "no error would have been committed," since the material was before the court and was obviously obscene.

In Rosen, the Court treated a question of fact, the obscenity of the material, which was obvious and uncontradicted, as a "question of law" and therefore a proper subject of a binding instruction. The Court would not have approved a directed verdict of guilty, yet it said that a binding instruction as to one element of the crime would have been proper.

In the case of Dennis v. United States, 341 U.S. 494, 513, 71 S.Ct. 857, 95 L.Ed. 1137 the Court had under consideration the propriety of the trial court's instruction to the jury that the court took judicial notice that a certain element of the crimes existed, and that the jury must take its existence as a fact. The crimes charged were violations of the conspiracy provisions of the Smith Act, which made advocacy of the overthrow of the government unlawful. The trial court had recognized that, in addition to the specific acts of advocacy, etc., specified in the statute, it was necessary, in order not to run afoul of the freedom of speech guarantee of the First Amendment, that there be a "clear and present danger" that the advocacy described in the statute might result in overthrow of the government. The existence of "clear and present danger" was, therefore, an element of the crime. Judge Medina, in the district court, instructed the jury:

> * * * I find as a matter of law that there is sufficient danger of a substantive evil that the Congress had a right to prevent, to justify the application of the statute under the First Amendment of the Constitution.
>
> This is a matter of law about which you have no concern. It is a finding on a matter of law which I deem essential to support my ruling that the case should be submitted to you to pass upon the guilt or innocence of the defendants.

The defendants in Dennis were convicted. In the Supreme Court of the United States they attacked the constitutionality, under the constitutional guarantee of trial by jury, of the trial court's binding instruction on clear and present danger.

The Supreme Court rejected the attack. Chief Justice Vinson said, for the Court:

> When facts are found that establish the violation of a statute, the protection against conviction afforded by the First Amendment is a matter of law. The doctrine that there must be a clear and present danger of a substantive evil that Congress has a right to prevent is a judicial rule to be applied as a matter of law by the courts. The guilt is established by proof of facts. Whether the First Amendment protects the activity which constitutes the violation of the statute must depend upon a judicial determination of the scope of the First Amendment *applied to the circumstances of the case.* (Italics added.)

"The circumstances of the case," referred to in the last phrase in the foregoing quotation, are facts. As Mr. Justice Douglas points out in his dissenting opinion, with which Mr. Justice Black agreed, there was no evidence in the record as to the strength of the Communist Party in the United States, the positions of Communists in industry and government, the extent to which they have infiltrated the police, the armed services, transportation, stevedoring, power plants, munitions works and other critical places.

It is apparent that the trial judge, in taking judicial notice that a clear and present danger existed, must have had in mind a considerable congeries of facts which led him to that conclusion which seemed to him so obviously right that to require evidence of those facts would be a sheer waste of time, a futile formality. The Supreme Court agreed with the trial judge, and approved his binding instruction because it related to "a matter of law." It is perhaps of significance that Judge Medina, in his instruction quoted hereinabove, referred to it as a "finding," which suggests that it was based upon facts.

In the instant case, the status of United Airlines as a common carrier engaged in the interstate transportation of goods is indisputable and undisputed. Whether we approve the trial court's instruction that it was so engaged as a proper exercise of judicial notice or, as the Supreme Court did in Rosen, supra, and Dennis, supra, as a ruling upon a matter of law, we arrive at the same conclusion. The giving of the instruction was not error.

Appellant Gold contends that his several motions for acquittal should have been granted because he made no "use" of a common carrier as required by 18 U.S.C.A. section 1462, which provides that the crime has been committed when one " * * * knowingly uses any express company or other common carrier, for carriage in interstate or foreign commerce" of the proscribed matter. He contends that section 1462 requires actual carriage in interstate commerce and that no violation occurred upon merely delivering property to the airline's freight agent.

The question of what acts constitute "use" of a common carrier for the purposes of section 1462 does not appear to have been answered in reported decisions. Prior to 1958, section 1462 prohibited the knowing "deposit" of the proscribed matter for carriage in interstate commerce. In United States v. Ross, 205 F.2d 619 (10 Cir. 1953), the court held that this language made the crime complete when the deposit was made and that, therefore, the offense could be prosecuted only in the district of deposit. In 1958 the section was amended to provide for prosecution at the place of receipt as well as the place of deposit of proscribed matter, but substituting the word "uses" for the word "deposits." See P.L. 85–796, 72 Stat. 962 (1958). The legislative history of this amendment makes it clear that the legislature intended to broaden the scope of the statute as interpreted in Ross by making the offense a continuing one and did not intend to reduce in any way the coverage which the statute had under the prior language. See U.S. Cong. and Ad. News, 4012 (1958); United States v. Luros, 243 F.Supp. 160 (N.D.Iowa 1965); United States v. West Coast News Co., 30 F.R.D. 13 (W.D.Mich. 1962). We conclude that interstate commerce is "used" and a crime committed under section 1462 when proscribed matter has been deposited with a common carrier for the purpose of its being transported in interstate commerce.

Appellant Gold urges that the court committed reversible error when it refused to inquire into the religious background of the jurors upon voir dire examination. The trial judge considered the request and concluded that such an inquiry would be improper. This was within the discretion of the court, and appellant's contention is wholly without merit. See Yarborough v. United States, 230 F.2d 56, 63 (CA 4, 1956), cert. den. 351 U.S. 969, 76 S.Ct. 1034, 100 L.Ed. 1487 (1956).

Appellants Fusco and Halbett attack their convictions under the conspiracy count on the ground of insufficient evidence. As to Halbett, there was evidence that he had worked in the film laboratory where the films here in question were processed for a year and a half before the time of the shipment with which we are concerned; that during the several days preceding the attempted shipment he and Gold were the only persons, except on one occasion a small girl, who entered the laboratory; that they, at the end of those several days, carried from the laboratory five cartons, each carton containing 200 obscene films; that a search, on a warrant, of the laboratory shortly thereafter disclosed that some 1500 films, of which only seventeen were obscene, were left in the laboratory and that most of them were dusty and dirty and in disorder and had not been recently handled.

We think that the jury could, with propriety, have concluded from the foregoing evidence that Halbett, during those several days, had been assisting Gold in processing and packing for shipment 1000 obscene films and thereby conspiring with Gold to commit the crime here involved. The jury did so find, the district court rendered judgment on the verdict against Halbett, and we will not disturb that judgment.

The evidence as to the appellant Fusco is that on November 4, 1965, the day after Gold had deposited the five cartons with United Airlines in Las Vegas for shipment, Fusco and a woman

came to United's freight counter in Newark, New Jersey. The woman told the attendant the number of the air way-bill, and attempted to describe the shipment. Fusco corrected her, telling the attendant how many packages there were, and their approximate weight. Upon being informed that the shipment had not arrived, Fusco and the woman drove away together. Obviously, Fusco and the woman had been advised by Gold of the shipment, the waybill number, and the number of the packages and their weight. It would stretch credulity beyond the breaking point to suppose that Fusco expected to receive from the airline five packages of Mickey Mouse films, or films of comparable content. The jury concluded that he knew what was supposed to have been shipped, and that he had conspired with Gold to receive a shipment of obscene films. We find no impropriety in the verdict and judgment against Fusco.

The judgments against the appellants are affirmed.

The opinion issued on March 30, 1967, is withdrawn, and the foregoing opinion is substituted for it. The appellant's petition for a rehearing is denied.